**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **SANDRA LEE BECKER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case number 4:11cv0803 TCM** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the

applications of Sandra Lee Becker for disability insurance benefits (DIB) under Title II of

the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security

income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b.[1] Ms. Becker has filed

a brief in support of her complaint; the Commissioner has filed a brief in support of his

answer.

## Procedural History

Ms. Becker (Plaintiff) applied for DIB and SSI in December 2007, alleging she was

disabled as of October 2, 2007, by intracranial hypertension, degenerative disc disease,

rheumatoid arthritis, osteoarthritis, irritable bowel syndrome, and mitral valve prolapse.

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of
the parties. See 28 U.S.C. § 636(c).

(R.[2] at 113-26.)  These applications were denied initially and after a hearing held in October 2009 before Administrative Law Judge (ALJ) Christina Young Mein.  (Id. at 6-19, 23-56, 58-62.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Jenifer Sara Teixeira, M.Ed., C.R.C.,[3] a vocational expert, testified at the administrative hearing.

Plaintiff testified that she was then 49 years of age, is 5 feet 7 inches tall, and weighs approximately 240 pounds, having gained over 100 pounds due to an inability to exercise and to the side effects of her medication.  (Id. at 27.)  She is right-handed, married, and lives with her husband and dependent, disabled 23-year old son.  (Id. at 28.)  Her son has Opitz Syndrome,[4] lung and heart disease, and arthritis, and he is slightly mentally retarded.  (Id.)  He requires "constant care"; she helps him with his medicine and cooking.  (Id.)  She receives monthly benefits for her son; her husband works.  (Id. at 34.)  She has a driver's license.  (Id. at 28.)  She does not have any hobbies or memberships in any clubs, groups, or organizations.  (Id. at 29.)  She does not smoke, use illegal drugs, or drink alcohol.  (Id.)

---

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

[3]Certified Rehabilitation Counselor.

[4]Opitz Syndrome is "a heterogeneous genetic condition characterized by a range of midline birth defects such as hypertelorism, clefts in the lips and larynx, heart defects, hypospadias and agenesis of the corpus callosum."  Lisa Maria Andres, M.S., Opitz Syndrome, http://www.healthline.com/galecontent/opitz-syndrome-1 (last visited Sept. 18, 2012).

She completed the twelfth grade; can read and write English; and can do arithmetic unless her medication is interfering with her ability to think.  (Id. at 33-34.)  She can make change.  (Id.)

Plaintiff's primary care physician has recommended that she see a pain management specialist.  (Id. at 30.)  She has not done so because she cannot bear to be touched.  (Id.)  This inability had prevented her from doing physical therapy.  (Id.)

Plaintiff takes liquid morphine for pain; Lasix to relieve the pressure in her brain; an antidepressant; and Symbicort for chronic obstructive pulmonary disease (COPD).  (Id. at 30, 31.)  The antidepressant does not help with her pain or her depression; instead, it makes her tired, nauseated, and dizzy.  (Id. at 31.)  Asked why she continues to take it, she explained that she has been told that she has to take it for six to eight weeks before it has the intended effect.  (Id.)

Plaintiff has pain in her back, neck, hips, wrists, elbows, and her right leg and ankle.  (Id. at 32.)  She has been told that the pain is caused by nerve damage.  (Id.)  She has had daily headaches since 1987.  (Id. at 42.)  The headaches have become worse during the last three and one-half years.  (Id. at 43.)

Asked what time she gets up in the morning, Plaintiff explained that it depends on when during the night she took more medication.  (Id. at 32.)  During the day, she primarily sits or lays around the house.  (Id.)  Her husband does the cooking.  (Id.)  She eats one meal a day.  (Id. at 44.)  She goes grocery shopping approximately once a week; her disabled son goes with her.  (Id. at 32-33.)  Her aunt or cousin usually drive them to the store.  (Id. at

41.)  She does not wash dishes, do laundry, vacuum, do yard work, or take out the garbage.  (Id. at 33.)  She talks to her son or "just lay[s] there."  (Id.)  Her husband has to help her in and out of the bathtub, shave her legs, do her hair, and help her dress.  (Id. at 40.)  If her husband has left for work before she gets up in the morning, her disabled son helps her get dressed.  (Id. at 41.)  Because of her pain, she sleeps two hours at most a night and has done so for at least two and one-half years.  (Id. at 44.)

For several years, Plaintiff worked part-time for a company that verified people's credit application information.  (Id. at 34-35.)  She had also performed some retail work, including working as a cashier at a hat store.  (Id. at 35.)  She explained that her wages had been low and sporadic due to her pseudotumor cerebri,[5] diagnosed in 1987.  (Id.)  The tumor causes her vision to frequently change.  (Id. at 36.)  She has several pairs of glasses and different pairs of contacts to use with the glasses.  (Id.)

She last worked in 2006 or 2007.  (Id. at 37.)  She left that job because of the pain, tumor, and medication.  (Id.)  She has not attempted to find work since.  (Id.)

Because of her medications, she is not supposed to drive.  (Id.)  The medications cause memory loss, forgetfulness, and disorientation.  (Id. at 39.)

---

[5]A pseudotumor cerebri, or benign intracranial hypertension, is "a disorder characterized by increased intracranial pressure in the absence of any evidence of intracranial space-occupying lesion, obstruction of the ventricular or subarachnoid pathways, infection, or hypertensive encephalopathy. Etiology in most instances in unknown . . . .  The condition is more common in women between 20 and 50, especially in those who are overweight."  Merck Manual of Diagnosis and Therapy, 1483 (16th ed. 1992) (emphasis omitted).

Also, Plaintiff suffers from depression and has panic attacks two to three times a day. (Id. at 38.)  She cries a lot, sometimes a couple of times a day.  (Id. at 38, 43-44.)  Her panic attacks can be caused by being in public or an enclosed space, e.g., an elevator.  (Id. at 38.)

She has problems holding on to things with her hands or feeling temperature in her right hand.  (Id. at 39.)  She has pain that radiates up her right arm to her elbow.  (Id.)

Testifying as a vocational expert (VE), Ms. Teixeira classified Plaintiff's work in the past fifteen years as a credit clerk as semi-skilled and sedentary and as a sales person as light and semi-skilled.  (Id. at 46.)

The ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education, and work experience who is capable of light work[6] and occasional balancing, stooping, kneeling, crouching, crawling, and stair climbing; who can not reach overhead or climb ladders, ropes, or scaffolds; who must avoid work hazards; who can perform only one- to two-step tasks in low-stress environments; who can not have interaction with the public; and who can have only occasional interaction with co-workers.  (Id. at 47.)  The VE testified that this person can not perform Plaintiff's past work.  (Id.)  This person can, however, perform jobs as an office helper.  (Id.)  This is a light, unskilled job that exists in significant numbers in the regional and national economies.  (Id.)  This job requires frequent handling and fingering.  (Id. at 47-48.)  There are also sedentary jobs of a callout operator and telephone quotation clerk; both these exist in significant numbers in the regional and

_____

[6]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

national economies.  (Id. at 48-49.)  Both require frequent handling and reaching.  (Id.)  The office helper job has a reasoning level of two and the telephone quotation clerk and callout operator jobs have reasoning levels of three.  (Id. at 49, 50.)  The VE testified that only sheltered employment will have one to two-step tasks. (Id.)  Asked if a reasoning level of three was inconsistent with the ALJ's "limitations of one to two step tasks and low stress job requiring only occasional decision making and occasional changes in the work setting," the VE replied, "No."  (Id. at 51.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, and records from various health care providers.

When applying for DIB and SSI, Plaintiff completed a Disability Report, listing her height as 5 feet 7 inches and her weight as 198 pounds.  (Id. at 170-78.)  Her ability to work is limited by intracranial hypertension,[7] degenerative disc disease, rheumatoid arthritis, osteoarthritis, irritable bowel syndrome, and mitral valve prolapse.  (Id. at 171.)  These impairments cause debilitating, daily headaches; frequent vision changes; pain in her legs, back, and neck; problems in her joints; uncontrolled bowel movements; and occasional heart irregularity.  (Id.)  These first bothered her in 1987 and stopped her from working on October 2, 2007.  (Id.)

---

[7]See note 5, supra.

Plaintiff reported on a Missouri Supplemental Questionnaire that a pseudotumor cerebri, hypertension, fibromyalgia, and arthritis keep her from working because they cause her constant, painful headaches; vision changes; pain and numbness in her hands, legs. and feet; pain and stiffness in her neck, back, arms, and legs; diarrhea; and constant vomiting. (Id. at 150-58.) Any movement makes her symptoms worse. (Id. at 150.) She uses a cane. (Id. at 152.) She cooks for her 21-year old son. (Id. at 153.) Her son put rails on her tub to help her get in and out of the tub. (Id.) The only household chore she does is washing dishes. (Id. at 154.) Because of her pain and vision difficulties, she can watch a thirty-minute television show, but not a sixty-minute one. (Id. at 155.) She can use a computer for ten minutes at most. (Id. at 156.) She does not have any difficulties following written or spoken instructions. (Id. at 157.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications. (Id. at 182-88.) There had been no changes, for better or worse, in her previously-described impairments. (Id. at 183.) Now, she also suffers from stress caused by the constant pain, an inability to sleep or eat, and from anxiety attacks. (Id.) She needs assistance in dressing, bathing, and getting in and out of a car or bed. (Id. at 186.) She can not go up and down stairs or do household chores. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin with the September 2001 record of Gregory Baker, M.D.,[8] when Plaintiff

---

[8]Dr. Baker is with the Baker Medical Group. It is apparent from the records of that Group and various test results that Plaintiff was not always seen by him. Because of the difficulty in reading the signatures on the office record notes, however, the Court will refer to Dr. Baker when referring to any health care provider at the Baker Medical Group.

consulted him about stress headaches that were preventing her from sleeping at night.[9] (Id. at 284.)  Plaintiff was referred to another physician, Dr. Glaser.  (Id.)  Plaintiff consulted Dr. Baker in November about headaches and was diagnosed as being perimenopausal.  (Id. at 283.)

After seeing Dr. Baker in February 2002 about headaches, left arm numbness, and congestion, Plaintiff was diagnosed with allergic rhinitis.  (Id. at 280.)  Two months later, Plaintiff consulted Dr. Baker about back pain of five days' duration.  (Id. at 278.)  X-rays taken the next day of Plaintiff's lumbar spine revealed disc space narrowing at L4-5 and a schmorl node indicative of early degenerative disc changes.  (Id. at 308.)  In August, she saw Dr. Baker for complaints of neck pain, sore throat, headaches, and shoulder pain.  (Id. at 273.)  She was described as being in no apparent distress, and was diagnosed with pharyngitis.  (Id.)  In October, she saw him for chest pains and headaches.  (Id. at 271.)  He thought it likely she had gastritis.  (Id.)  A lumbar spine magnetic resonance imaging (MRI) taken in November was "unremarkable."  (Id. at 299.)

In February 2003, Plaintiff consulted Dr. Baker for back and neck pain and a sore throat; she was diagnosed with pharyngitis.  (Id. at 269.)  She next saw him five months later for stress, depression, and chest pain caused by bronchitis.  (Id. at 265.)  Her husband was not working and she was under financial strain.  (Id.)  She was diagnosed with malaise and anxiety.  (Id.)

---

[9]Dr. Baker's office notes tend to be brief, including only one or two word descriptors of Plaintiff's complaint and diagnoses; many of the notes also tend to be illegible.  The notes do routinely indicate that Plaintiff declined to be weighed.

In October, Plaintiff complained of left foot numbness, neck and lower back pain, and a left earache when she saw Dr. Baker.  (Id. at 263.)  She was scheduled for a physical therapy appointment on November 3.[10]  (Id.)  Plaintiff reported on November 20 that her back pain was better with the physical therapy.  (Id. at 262.)

In January 2004, Plaintiff had MRIs of her lumbar and cervical spines.  The MRIs of her lumbar spine showed a normal alignment and early degenerative changes at L4-5 with decreased signal intensity at T2.  (Id. at 303, 304, 338.)  The MRI of the cervical spine also showed a normal alignment and normal signal intensity within the marrow space of the cervical vertebral bodies.  (Id. at 302, 337.)

After examining Plaintiff in February for her complaints of left-sided back pain, arm pain, and difficulty deep breathing, Dr. Baker questioned whether she had somatization[11] and listed myalgia (muscular pain[12]) as a diagnosis.  (Id. at 259.)

Plaintiff complained to Dr. Baker in April of chest pain, shortness of breath, and neck and facial numbness.  (Id. at 257.)  She was scheduled for a stress test in June.  (Id.)

Plaintiff consulted Max P. Benzaquen, M.D., a neurologist, on July 12 and was described as having a history of arthralgias (severe joint pain[13]) and muscle aches, primarily

---

[10]There is no indication in the record that she kept the appointment.

[11]Somatization is "[t]he process by which psychological needs are expressed in physical symptoms; e.g., the expression or conversion into physical symptoms of anxiety . . . "  Stedman's Medical Dictionary, 1634 (26th ed. 1995)  (Stedman's).

[12]See Stedman's at 1161.

[13]See Stedman's at 149.

in her legs.  (Id. at 234.)  She was having difficulty sleeping and complained of spasms.

(Id.)  On examination, she had no deficits in her motor functioning, no Babinski sign,[14] good

coordination of fine movements, and no abnormalities in her gait.  (Id.)  She had decreased

sensation "to touch in glove and stocking distribution."  (Id.)  She was prescribed Ultracet.[15]

(Id.)  That same month, Plaintiff underwent a nerve conduction study.  (Id. at 339-41.)  The

study revealed mild sensory neuropathy.  (Id. at 340.)

Plaintiff informed Dr. Benzaquen when she saw him in August that she had had only

partial pain relief on the Ultracet.  (Id. at 333.)  She was given samples of Topamax to start

trying to lose weight and was to see a rheumatologist for the same reason.  (Id.)

Plaintiff complained of neck and right shoulder pain when she saw Dr. Baker in

September.  (Id. at 254.)  He opined that the pain was likely due to bursitis.  (Id.)

To investigate the cause of her chest pain, Plaintiff had a treadmill test in January

2005.  (Id. at 193.)  It was normal.  (Id.)

---

[14]"Babinski's sign is the extension of the great toe with fanning of the other toes, and is of spinal origin and attests to an upper motor neuron lesion."  **Davis v. Callahan**, 125 F.3d 670 674 n.10 (8th Cir. 1997 ) (internal quotations omitted).

[15]Ultracet is a combination of acetaminophen and tramadol and is prescribed "[f]or the short-term management of acute pain."  mediLexicon, Ultracet, http://www.medilexicon.com/drugsearch.php?s=ultracet&search (last visited Sept. 18, 2012).

Plaintiff complained to Dr. Baker in March of low back and neck pain that had become worse after Christmas. (Id. at 253.) Straight leg raises were negative.[16] (Id.) She was prescribed Vicodin.[17] (Id.)

Plaintiff complained to Dr. Baker in April of neck, back and foot pain and of severe headaches. (Id. at 251.) She explained that she had felt a sharp pain when shopping the day before and that, although she had then rested all day, the pain had not gone away. (Id.) X-rays of Plaintiff's right foot were negative. (Id. at 297.)

Plaintiff returned to Dr. Benzaquen on May 2, reporting a "left frontal ice pick headache" the previous week and a loss of vision. (Id. at 332-33.) She had taken four aspirin and drunk Coke. (Id.) Dr. Benzaquen noted that she had "some mild papilledema."[18] (Id. at 332.) He planned on Plaintiff having a computed tomography (CT) scan of the brain, started her on Diamox, and stopped the Vicodin, which he noted she was taking too much of. (Id.) The CT scan was unremarkable. (Id. at 335.) It was recommended that she have an MRI if her symptoms persisted. (Id.)

---

[16]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 n.3 (8th Cir. 2009) (internal quotations omitted).

[17]Vicodin, a combination of hydrocodone and acetaminophen, is prescribed for the relief of moderate to moderately severe pain. Physicians' Desk Reference, 575 (65th ed. 2011) (PDR).

[18]Papilledema is "[e]dema of the optic disk, often due to increased intracranial pressure." Stedman's at 1291.

On May 12, Plaintiff saw Dr. Baker for her recurrent shortness of breath on exertion. (Id. at 252.)  She was diagnosed with asthma and prescribed Albuterol.  (Id.)

Plaintiff continued to have papilledema in both eyes when she saw Dr. Benzaquen in June.  (Id. at 331.)  Her vision was 20/40 in both eyes.  (Id.)  She was to continue taking Diamox and was started on Dyazide and potassium supplements.  (Id.)  She was described as having benign intracranial hypertension.  (Id.)

Plaintiff reported to Dr. Baker in September that her left knee had started hurting the night before.  (Id. at 248.)  A Doppler venous ultrasound of Plaintiff's left lower extremity showed no deep venous thrombosis.  (Id. at 293.)

Dr. Benzaquen noted when seeing Plaintiff in October that she had lost some weight.[19]  (Id. at 330.)  She was allergic to Diamox and Dyazide.  (Id.)  She would "probably . . . need furosemide as needed."  (Id.)

Plaintiff was diagnosed with acute bronchitis after seeing Dr. Baker in January 2006. (Id. at 247.)

X-rays taken of Plaintiff's right ankle and foot in April were, with the exception of "some minimal spurring at the calcaneaus," normal.  (Id. at 233.)  There was no evidence of a fracture.  (Id.)

Plaintiff next saw Dr. Benzaquen in May, complaining of a "right hemicrania headache that is mostly parietal and temporal."  (Id. at 329.)  On examination, she had "mild

---

[19]Her weight is not listed.

disk blurring," but no other motor or sensory abnormalities. (Id.) Indomethacin (a nonsteroidal anti-inflammatory drug) was added to her prescriptions. (Id.)

In August, Plaintiff complained to Dr. Baker of a sore throat, headaches, and neck pain. (Id. at 274.) His diagnosis was cervical radiculopathy. (Id.)

Plaintiff reported to Dr. Baker on Thursday, November 30, that she had pain in her left knee since that Monday. (Id. at 240.) She could hardly walk and could not flex or extend the knee. (Id.) She was diagnosed with left knee pain and effusion. (Id.)

Plaintiff saw Kamlesh C. Vyas, M.D., on June 19, 2007, reporting a decreased range of motion in her back.[20] (Id. at 215-16.) X-rays revealed osteoarthritis at the right L3-4 facet. (Id. at 222.)

The next day, she saw Dr. Baker, complaining of "achey bones," upset stomach, numb fingers and mouth, and low back pain. (Id. at 237.) She was diagnosed with viral flu. (Id.) A rare notation is made of her weight – 172 pounds. (Id.)

On July 6, she returned to Dr. Baker. (Id. at 235.) Her body ached, including her chest and back, and had since the day before. (Id.) She was diagnosed with myalgia and referred to the emergency room. (Id.)

Plaintiff reported to Dr. Vyas on July 18 that her back pain was not better and requested stronger medication. (Id. at 213-14.) She could not tolerate the physical therapy. (Id.) An MRI of Plaintiff's cervical spine revealed (a) central disc herniation at C4-5 with ventral dural displacement but no significant central or foraminal stenosis and (b) minimal

---

[20]As with Dr. Baker's notes, the office notes of Dr. Vyas are brief and often illegible.

degenerative disc disease at C6-7.  (Id. at 201, 220, 232.)  An MRI of her lumbar spine revealed mild central canal and moderate bilateral foraminal stenoses at L2-3 and L3-4.  (Id. at 202, 221.)  There were no significant disc bulges or protrusions at any level.  (Id.)

At the requests of Drs. Benzaquen and Vyas, Plaintiff had a neurosurgical consult with J.A. Marchosky, M.D., in September for her complaints of constant pain in her neck and back and numbness in her right arm and hand.  (Id. at 204-07.)  She reported having injured her neck on May 23 when she fell on a parking lot.  (Id. at 204.)  She had cervical pain radiating to her right shoulder and upper extremity, intermittent paresthesias,[21] and numbness with weakness.  (Id.)  She had started noticing three months earlier that she will sometimes drop things held in her right hand.  (Id.)  She had a history of generalized headaches dating from 1987, when she had been diagnosed with pseudotumor cerebri, the cause of which had not been found.  (Id.)  She also had a one and one-half year history of low back pain radiating to her right hip and lower extremity; the pain had intensified since her fall.  (Id.)  She attributed her increase in weight to the treatment of her pseudotumor. (Id.)  She weighed 255 pounds.  (Id. at 205.)  On examination, Plaintiff denied, among other things, weight change, chest pain, seizures, memory loss, anxiety, depression, vomiting, and frequent diarrhea.  (Id. at 204-05.)  There was no clubbing, cyanosis, peripheral edema, tenderness, or discoloration in her upper and lower extremities.  (Id. at 206.)  She had a good range of motion in her upper and lower extremities; her joints appeared stable.  (Id.)

---

[21]Paresthesia is "[a]n abnormal sensation, such as of burning, pricking, tickling, or tingling." Stedman's at 1300.

The muscle structure in her upper and lower extremities had no loss of functional strength, no spasticity, and no rigidity; her coordination showed "normal rapid alternating movements." (Id.) She was oriented to time, place, and person and had no memory or attention span defects. (Id.) She had a steady gait and was steady when standing. (Id.) She "demonstrated approximately normal visual acuity." (Id.) Her hearing was normal. (Id.) She could stand in the Romberg position without swaying or falling.[22] (Id.) There was a "mild limitation of motion of the lumbar spine." (Id.) Radicular symptoms were not elicited. (Id.) Straight leg raises were 80 to 90 degrees on the right and 90 on the left. (Id. at 207.) She had mild bilateral paracervical muscle tightness. (Id.) After also reviewing Plaintiff's MRIs, Dr. Marchosky opined that her "cervical symptoms could certainly be related to cervical degenerative disk disease at C4-5 and C6-7" and also diagnosed her with lumbar degenerative disc disease at L2-3 and L3-4, in addition to moderate obesity and pseudotumor cerebri. (Id.) He recommended long-distance walking and weight control. (Id.) If that course failed to relieve her symptoms, he recommended she have a cervical myelogram and CT scan. (Id.)

The following day, Plaintiff saw Dr. Vyas about a right foot sprain. (Id. at 211-12, 219.) X-rays revealed that there was no fracture. (Id. at 219.)

Plaintiff consulted Dr. Baker in October, reporting having had back pain since May 2007 after falling at work. (Id. at 231.) She was diagnosed with disc disease and was to

---

[22]"The 'Romberg sign' is the inability to stand (feet together or slightly less than shoulder width apart) without becoming unsteady, swaying or falling over." **Grebenick v. Chater**, 121 F.3d 1193, 1196 n.3 (8thCir. 1997).

see a specialist[23] as soon as possible.  (Id.)  There is a notation of "lift chair" without explanation.  (Id.)  Her current medications included Lasix for her benign intracranial hypertension, furosemide for benign essential hypertension, and cyanocobalamin for her vitamin B12 deficiency.  (Id. at 359.)

When Plaintiff saw Dr. Vyas in February 2008, anxiety was one of four diagnoses.  (Id. at 368-69.)  An x-ray of her abdomen was negative.  (Id. at 382.)  She was prescribed Percocet.[24]  (Id. at 370.)  Two months later, her blood pressure was higher.  (Id. at 365-66.)  She was in a lot of pain, but did not want any injections.  (Id. at 365.)  She had palpitations on the Darvocet.  (Id.)  Her Percocet prescription was renewed.  (Id. at 367.)  The following month, in May, Plaintiff reported to Dr. Vyas an increase in neck pain and numbness in her hands.  (Id. at 360-63.)  She was prescribed Lidoderm patches and Soma for her low back pain.  (Id. at 362-63.)  In June, she was prescribed Toradol, a nonsteroidal anti-inflammatory drug.  (Id. at 364.)

Plaintiff saw Dr. Vyas again in January 2009 for her neck and back pain.  (Id. at 354-55.)  On examination, she was described as frustrated and edgy; she had a steady gait and station.  (Id. at 355.)  In February, Plaintiff was prescribed Tramadol.[25]  (Id. at 371.)

Plaintiff was evaluated by Richard A. Head, M.D., a neurologist, in March.  (Id. at 383-84.)  Plaintiff reported that she "ha[d] occasional 'heartbeat' headaches," feeling like

---

[23]The name is illegible.

[24]Percocet is a combination of oxycodone hydrochloride and acetaminophen and is prescribed for the relief of moderate to severe pain.  PDR at 1096-97.

[25]See note 15, supra.

her head was "on fire" and experiencing dizzy spells and mental confusion. (Id. at 383.) Her blood pressure would spike during these episodes. (Id.) She had had an ear, nose, and throat evaluation by Dr. Steven West. (Id.) She took Lasix for her pseudotumor cerebi, which caused only occasional headaches, and had been on Diamox, which had caused problems with her fingers and toes. (Id.) She had been in a motor vehicle accident the previous year and had badly injured a disc in her neck. (Id.) "She very rarely had double vision," and denied loss of vision. (Id.) On examination, she was awake, alert, attentive, oriented, had fluent and appropriate speech, followed commands, and had a normal mental status. (Id.) Her visual fields were full; her extraocular movements were intact; her pupils were round and reacted to light; her "discs" were moderately swollen; her hearing was intact. (Id.) She had 5/5 muscle strength in her upper and lower extremities. (Id. at 384.) "Cerebellar testing of finger-to-nose and heel-to-shin [was] normal," as was sensory testing. (Id.) Her reflexes and gait were also normal. (Id.) Dr. Head's impression was of a chronic history of pseudotumor cerebri and headaches "fairly well" controlled on Lasix. (Id.) He recommended she continue with her current treatment regimen. (Id.)

On June 15, Dr. Vyas prescribed morphine sulfate[26] for Plaintiff's neck pain. (Id. at 349.) She continued to be prescribed Lasix and cyanocobalamin. (Id. at 352-53.) She was not prescribed anything for low back pain, benign essential hypertension, or insomnia. (Id.)

---

[26]Morphine sulfate is for the treatment of moderate to severe chronic pain. See mediLexicon, Morphine Sulfate, http://www.medilexicon.com/drugsearch.php?s=morphine+sulf&search (last visited Sept. 18, 2012).

An MRI of Plaintiff's lumbar spine taken in July revealed (a) left lateral bulging of the L3-4 disc, narrowing the exiting keyhole on the left, and (b) flattening of the normal concave disc at L4-5 without focal disc herniation.  (Id. at 381.)  Two weeks later, Plaintiff reported to Dr. Vyas that she had a lot of back pain which was made worse by laying down.  (Id. at 346.)  On July 24, Dr. Vyas noted that Plaintiff had a mild low kidney function.  (Id. at 380.)  It was to be watched.  (Id.)

## The ALJ's Decision

Analyzing Plaintiff's application under the Commissioner's five step evaluation process, the ALJ first found that Plaintiff met the insured status requirements through September 30, 2009, and had not been engaged in substantial gainful activity since her alleged disability onset date of October 2, 2007.  (Id. at 10-11.)  The ALJ next found that Plaintiff had severe impairments of degenerative disc disease of the lumbar and cervical spines, pseudotumor cerebi, fibromyalgia, chronic fatigue syndrome, obesity, and anxiety.[27]  (Id. at 11.)  These impairments cause Plaintiff significant limitations in her ability "to perform basic work activities."  (Id. at 12.)  Her irritable bowel syndrome was not severe as she had not sought treatment or medication for the condition during the relevant period.  (Id. at 13.)  There was no evidence of mitral valve prolapse.  (Id.)

Plaintiff's severe impairments did not, however, singly or in combination, meet or medically equal an impairment of listing-level severity.  (Id.)

---

[27]The fibromyalgia and chronic fatigue syndrome findings are based on the records of Dr. Baker.  The anxiety impairment is based on his prescription of a psychotropic medication.

Plaintiff had, the ALJ concluded, the residual functional capacity (RFC) to perform light work except for lifting or carrying occasionally no more than twenty pounds and frequently no more than ten pounds; standing or walking no longer than six hours in an eight-hour day; only occasionally balancing, stooping, kneeling, crouching, crawling, and climbing stairs; never climbing ladders, ropes, or scaffolds; and never being exposed to unprotected heights and moving machinery. (Id.) She could not perform jobs that required the use of her upper extremities for reaching overhead. (Id.) Also, she was limited to performing jobs requiring only simple, routine, one- or two-step tasks in a low-stress environment with no public contact and no more than occasional interaction with co-workers and supervisors. (Id.)

When assessing Plaintiff's RFC, the ALJ evaluated her descriptions of her symptoms and found them not to be entirely credible. (Id. at 14-19.) Detracting from that credibility was Plaintiff's poor work record that "has never demonstrated a consistent motivation to work." (Id. at 14.) Her daily activities were also a detractor. (Id.) She cared for her disabled son, performed light household chores, and grocery shopped. (Id.) And, insofar as those activities were consistent with her descriptions, they appeared to be so as a matter of choice rather than necessity. (Id.) Her subjective complaints were not supported by the objective medical evidence, including Dr. Marchosky's examination findings. (Id. at 15.) She had never sought psychiatric intervention for mental health. (Id.) She had not seen a neurosurgeon for her neck and back pain as recommended by Dr. Vyas. (Id.) His notes indicated that her fibromyalgia and anxiety were controlled by medication. (Id.) Current

treatment for her pseudotumor cerebri appeared to control her headaches, and there were "little in the way of vision problems associated with" that condition.  (Id.)  And, although Plaintiff's anxiety was a severe impairment, it resulted in only mild mental functional limitations, mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning and concentration.  (Id. at 16.)  There was no evidence that it caused repeated episodes of decompensation of established duration.  (Id.)  Her mental impairments did "impose moderate symptoms and limitations with her capacity to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, and respond appropriately to the general public, co-workers, supervisors, or normal work stress."  (Id.)

With her RFC, Plaintiff was unable to perform any past relevant work.  (Id. at 17.) With her age, education, work experience, and RFC, there were jobs in the national economy she could perform.  (Id.)  These jobs had been described by the VE.  (Id. at 17-18.)

Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id. at 18.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous

work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. Accord **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006). Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work to do basic work activities." **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." **Id.** at 708 (internal citations omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments

listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "'The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (second alteration in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d

1211, 1217 (8th Cir. 2001). This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524, which cited Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See</u> <u>also</u> 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting <u>Hiller v. S.S.A.</u>, 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d

1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred when assessing his RFC and when relying on the inconsistent testimony of the VE.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitation." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. See also SSR 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings,

effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment"). The ALJ may not, however, "play[ ] doctor." **Pate-Fires v. Astrue**, 564 F.3d 935, 946-47 (8th Cir. 2009) (finding that ALJ had impermissibly done so when concluding noncompliance of claimant diagnosed with bipolar disorder with psychotic features was attributable to her free will).

Plaintiff argues that the ALJ's failure to discuss her obesity when assessing her RFC is a fatal error. Obesity is to be considered "a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." Social Security Ruling 02-01p, 2000 WL 628049 at *4. "There is[, however,] no specific level of weight or BMI [body mass index] that equates with a 'severe' or a 'not severe' impairment." Id.

Plaintiff did not cite obesity as a disabling condition on her applications, on forms she completed, including the Function Report, or in her testimony. She consistently cited pain as the reason for any physical functional limitations. When seen by Dr. Marchosky in September 2007, she weighed 255 pounds, but had a good range of motion in her upper and lower extremities, no loss of functional strength, and a steady gait. Dr. Marchosky recommended long-distance walking. When seen by Dr. Vyas in January 2009, her gait was again described as steady. Two months later, it was noted that she had a full range of motion and muscle strength in her upper and lower extremities and a normal gait. In **McNamara**

**v. Astrue**, 590 F.3d 607, 611 (8th Cir. 2010), the Eighth Circuit rejected an argument that the ALJ had erred by failing to discuss in her decision the claimant's obesity "as a potential work-related limitation."  The court noted that no physician had "ever placed physical limitations on [the claimant's] ability to perform work-related functions because of her obesity."  **Id.**  Nor had she described such in the Function Report or in her testimony.  **Id.**  In the instant case, Plaintiff did not cite any physical limitations caused by her obesity in reports or in her testimony.  Moreover, not only do her medical records fail to cite any such limitations, one physician encouraged her to do long-distance walking.  The ALJ did not err in not specifically discussing Plaintiff's obesity.

Plaintiff argues that the ALJ's response to her finding that no health care provider had ever stated or implied that she was disabled should have been to recontact those health care providers.

As noted by Plaintiff, "[a] social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."  **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2005).  "Where 'the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations,' the claimant has received a 'full and fair hearing.'"  **Jones**, 619 F.3d at 969 (quoting Halverson v. Astrue, 600 F.3d 922,  933 (8th Cir. 2010)).  Thus, "[t]he ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'"  **Vossen v. Astrue**, 612 F.3d 1011,

1016 (8th Cir. 2010) (quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004)); <u>accord</u> **Martise**, 641 F.3d at 926-27.

A crucial issue was not undeveloped in the instant case; rather, it was resolved unfavorably to Plaintiff. <u>See e.g.</u> **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision"); **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

Plaintiff also challenges the ALJ's reliance on the VE's testimony that she could perform the job of office helper, DOT 239.567-010, with her RFC, including not being able to perform jobs requiring overhead reaching or requiring more than simple, routine one- or two- step tasks in a low-stress environment with no public contact and with no more than occasional interaction with co-workers and supervisors. The job of office helper is light work. Asked by the ALJ if there was only one job Plaintiff could perform, the VE then cited two jobs at the sedentary level.

As explained in the DOT's description of the officer helper job, light work is more physically demanding than sedentary work.[28] <u>See</u> DICOT 239-567.010, 1991 WL 672232

---

[28]<u>Cf.</u> 20 C.F.R. § 404.1567(a) (defining sedentary work as that requiring "lifting [of] no more than 10 pounds at a time and occasional walking and standing") with 20 C.F.R. § 404.1567(b) (defining light work as that requiring "lifting [of] no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds").

(4th ed. rev. 1991). The job requires a reasoning level of two, defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." Id. The specific vocational preparation (SVP) level is two: "[a]nything beyond short demonstration up to and including 1 month."[29] Id. This job also requires frequent reaching. Id.

Level one reasoning is defined in the DOT "as the ability to '[a]pply commonsense understanding to carry out simple one- or two-step instructions.'" **Moore**, 623 F.3d at 604 (quoting *DOT*, 1011 (4th ed. 1991)) (alteration in original). Thus, the VE's testimony that Plaintiff could perform the requirements of the office helper position if able only to do simple, routine one- or two-step tasks is inconsistent with the *DOT*.

In **Moore**, the Eighth Circuit rejected a claimant's argument that a hypothetical describing a person with a twelfth grade education and "capable of carrying out simple job instructions and performing simple, routine and repetitive work activity at the unskilled task level" could only perform occupations requiring Level 1 reasoning. **Id.** The court specifically noted that "[i]n the hypothetical, the ALJ did not limit 'simple' job instructions to 'simple one- or two-step instructions' or otherwise indicate that [the claimant] could perform only occupations at a DOT Level 1 reasoning level." **Id.** In the instant case, however, the ALJ *did* limit the instructions to simple one- or two-step instructions.

---

[29]See **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010) ("The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance.").

The court in **Moore**, and now the Commissioner, notes that "'DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.'" **Id.** (quoting Page v. Astrue, 484 F.3d 1040, 1045 (8th Cir. 2007) (internal quotation marks omitted)). "'The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities.'" **Id.** (quoting Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir.2000)). "'In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT.'" **Id.** (quoting Wheeler, 224 F.3d at 897). In the instant case, however, the VE's identification of the job of office helper in response to a hypothetical expressly including a restriction of the person being able to follow only one- to two-step instructions, together with her apparent confusion about the difference in exertional levels, creates an unexplained inconsistency that must be resolved on remand.

## Conclusion

Plaintiff's arguments that the ALJ erred in assessing her RFC are without merit. The ALJ did err, however, in relying on the VE's identification of the job of office helper in response to the ALJ's hypothetical without sufficiently clarifying the reasoning levels of that job. Thus, the Commissioner has failed to carry his burden at step five. On remand, the Appeals Council shall remand the case to the ALJ for clarification of whether there are jobs Plaintiff can perform with her RFC. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for the further, limited proceedings as set forth above.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  20th  day of September, 2012.